**E-FILED**
Friday, 22 June, 2007  11:07:01 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

RONALD J. WEINAND,       )
      )
     Plaintiff,     )
      )
   v.      )    No.  05-3232
      )
DEPARTMENT OF VETERAN'S   )
AFFAIRS of the STATE OF   )
ILLINOIS,      )
      )
     Defendant.    )

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Department of Veteran's Affairs of the State of Illinois' (Department) Motion for Summary Judgment (d/e 36) (Defendant's Motion).  Plaintiff Ronald J. Weinand brings this action alleging that the Department discriminated against him on account of gender as to the payment of wages, in violation of the Equal Pay Act (EPA), 29 U.S.C. § 206 et seq., and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.  For the reasons stated <u>infra</u>, the Department's Motion for Summary Judgment is ALLOWED.

## STATEMENT OF FACTS

On April 1, 1990, Weinand began working as a staff pharmacist at the Illinois Veterans Home in Quincy, Illinois (Veterans Home), and was hired at Step 7 on the pay scale, the highest pay step available for the staff pharmacist position at that time.  Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment (d/e 37) (Defendant's Mem.), Exh. 17, Special Salary Request for Weinand. Weinand continued to be paid at Step 7 until June 2000.  Prior to assuming the position of staff pharmacist, beginning in November 1976, Weinand worked on a contractual basis as a pharmacist at the Veterans Home.  He also served on the pharmacy and therapeutics committee at the Veterans Home during the 1980s.  While working as a staff pharmacist at the Veterans Home, Weinand reported directly to Edwin Kerr, the Medical Director at the Veterans Home.  Weinand was not authorized to supervise any employees since he was in a collective bargaining unit.  However, he was the staff pharmacist in charge at the Veterans Home, and in that capacity he reported improprieties to the State of Illinois.

Weinand holds a bachelor of pharmacy degree from St. Louis College of Pharmacy, which was awarded in 1968.  Plaintiff's Response to Defendant's Motion for Summary Judgment (d/e 38) (Plaintiff's Response),

Excerpts from Deposition of Ronald Weinand (Weinand Dep.), at 14-15. After obtaining his degree in pharmacy, Weinand also became a member of the American Society of Consultant Pharmacists and took various courses, including a college computer course, to become educated in chart review and institutional pharmacy.  Id. at 17.  Weinand was a licensed pharmacist in both the State of Illinois and the State of Missouri.  Id. at 19.

The staff pharmacists employed at the Department are represented by the American Federation of State County and Municipal Employees (AFSCME), which is responsible for negotiating salary ranges and pay steps on behalf of the staff pharmacists statewide.  From 1990 until July 2002, there were seven pay steps available for the staff pharmacist position at the Department.  On July 1, 2000, as a result of negotiations with AFSCME, the State of Illinois implemented new salary ranges and pay steps for staff pharmacists.  The purpose of the July 2000 salary reconfiguration was to allow staff pharmacists (who were capped at Step 7) the opportunity to receive a general increase and step increases in the future.  Michael D. Murphy (who was the Division Manager of the Division of Technical Services at the Illinois Department of Central Management Services, from 1986 until November 2002) attests in his Affidavit that the July 2000 salary

reconfiguration was due in part to "the longstanding and continued difficulty agencies had in recruiting pharmacists to work for the State at the existing pay levels and the significant gap between the available pay ranges within the State pay structure and the compensation for pharmacists in the private sector." Defendant's Mem., Exh. 15, Affidavit of Michael D. Murphy (Murphy Aff.), ¶ 5. Murphy further attests in his Affidavit that, prior to the July 2000 salary reconfiguration, "individuals in the position whose salaries were at Step 7 [(including Weinand)] were unable to receive pay increases by moving to a higher step, since employees were required to be paid at one of the steps in the range." Id. at ¶ 6. As a consequence of the July 2000 reconfiguration, staff pharmacists who were at Step 7 of the pay scale were moved to a step lower than 7 in order to enable them to earn step increases in the future. Id. at ¶ 7. Following the July 2000 salary reconfiguration, Weinand's salary, which was at Step 7 of the applicable salary range before the reevaluation, "fell at Step 4 of the [newly adjusted] salary range for the Staff Pharmacist position." Defendant's Mem., at 6. Under the pay scale implemented in July 2000, Weinand received not only a general pay increase, but also an increase in his pay step from Step 4 to Step 5.

According to the Illinois Department of Central Management Services (CMS) Pay Plan (applicable to state agencies under the jurisdiction of the Governor, including the Department), an individual is normally hired at Step 1c of the salary grade.  Plaintiff's Response, Exh. 6, CMS Pay Plan. Under the Pay Plan, an entry salary higher than Step 1c requires proper documentation establishing qualifications above the minimum requirements, and an entry salary higher than Step 3 requires approval from the Director of CMS.  Id.

The Department was not only having problems retaining its staff pharmacists, but also in recruiting individuals for the staff pharmacist position at the Veterans Home.  In 1998, Warren Winston was hired as a staff pharmacist at the highest available pay step (namely, Step 7), but he left the employ of the Department on April 27, 1999.  In 1999, Wesley Zander was hired as a staff pharmacist at Step 7, but he left the employ of the Department on May 31, 2000.  In order to fill the vacant staff pharmacist position following Zander's departure, the Department attempted to recruit individuals to fill the vacancy, but to no avail. Weinand was aware that the Department had difficulties recruiting individuals for the staff pharmacist position at the Veterans Home and so

he actively participated in the Department's recruitment efforts.  Ronald Frillman (Administrator of the Veterans Home from approximately 1998 until 2002) acknowledged the Department's retention and recruiting problems.

It took the Department almost one year to recruit an individual for the vacant staff pharmacist position (namely, Julie Huseman).  According to Weinand, he informed Huseman's father, whom he had known since college, about the opening for the staff pharmacist position at the Department.  Weinand stated that Huseman thereafter talked to him about the job opening.  Huseman applied for the staff pharmacist position and was invited for an interview, which occurred in late January 2001.  The interview was conducted by Frillman and Sharon Hendricks, Head of the Personnel Department at the Veterans Home.

At the interview, Huseman stated that she was particularly interested in the position because of "the hours and the time off that the position allowed" and the "mission of the Veterans Home".  Plaintiff's Response, Excerpts from Deposition of Julie Huseman (Huseman Dep.), at 24.  She also noted, "the salary wasn't as important to me."  Id.  At the time of her interview with the Department, Huseman had been a licensed pharmacist

6

for approximately four months and was anticipating a doctorate degree in pharmacy from St. Louis College of Pharmacy.   The staff pharmacist position did not require a doctorate degree in pharmacy, however.

The accounts of Huseman and her interviewers (namely, Frillman and Hendricks) differ regarding the discussion of salary during and after the interview.   According to Huseman, during the interview Frillman asked whether a salary of $35,000.00 would be acceptable to her.   Huseman Dep., at 26.   In response, she stated that she could not justify that and that her husband would not allow her to take the job for that salary.   Id.   Huseman stated that she did not recall any other discussion concerning salary during the interview.   Id.   Huseman stated that, shortly following her interview, she received an offer letter from the Veterans Home, which noted an annual salary of $72,000.00.   Id. at 27.   She stated that she accepted the offer.   Id.   Shortly after Huseman's acceptance of the Department's offer, Huseman was told that Hendricks wanted her to stop by the Veterans Home because the Department was unable to offer her the salary mentioned in the offer letter.   Id. at 42.

Huseman stated that she went to see Hendricks at the Veterans Home on or about March 18, 2007, at which time she was told that there

7

had been a mistake and that the Department was unable to give her the salary noted in the letter.  Huseman was further informed at the meeting that the Department would be able to offer a salary that would be $10,000.00 or $15,000.00 lower than the salary agreed upon in the letter. Id. at 44-45.  Sometime before April 1, 2001, Huseman wrote a letter to Senator Donahue seeking her assistance in resolving the salary issue with the Department and in preventing such incidents from occurring in the future.  Huseman Dep., at 53.[1]  According to Huseman, sometime prior to April 1, 2001, Frillman contacted Huseman, informing her that "he was in Springfield and [that] he was trying to straighten out what had gone wrong and wanted to know more about [her] academic credentials."  Id. at 57. Huseman stated in her deposition that Frillman knew her academic credentials when he interviewed her back in late January 2001.  Id.

Hendricks' account of the salary discussion is as follows.  Hendricks testified that she and Frillman had a meeting to determine Huseman's salary.[2]  She stated that she advised Frillman "what the market was" and

---

[1]The record does not disclose Senator Donahue's first name.

[2]The record is not clear whether the meeting took place before or after Huseman's interview in late January 2001.

recommended a salary figure that would be acceptable to Huseman. Plaintiff's Response, Excerpts from Deposition of Sharon Hendricks (Hendricks Dep.), at 37-38.  She stated that Frillman would have then instructed her to prepare a special salary request to CMS to hire Huseman at "a higher salary than an interim salary." Id. at 38.  Hendricks testified that the Veterans Home submitted a salary request to CMS on behalf of Huseman on February 21, 2001. Id. at 42.  Hendricks said that she did not have a copy of the February 2001 salary request form, but indicated that it would be in Huseman's personnel file.  Id. at 43, 47.  Hendricks testified that, due to a clerical error in the February 2001 salary request, another salary request was submitted to CMS, seeking permission to hire Huseman at Step 7, which was equivalent to a monthly salary of $5,684.00.[3] Hendricks did not recall discussing, with Frillman, hiring Huseman at Step 6, rather than Step 7.  Id. at 47.

Frillman's account of the discussion of Huseman's starting salary during and after the interview is as follows.  Frillman, who had the authority to offer Huseman any amount of salary within the applicable pay range,

---

[3]Hendricks testified that the Veterans Home needed to obtain permission from CMS to hire an individual for the staff pharmacist position at a step higher than 3. Huseman Dep., at 43-44.

stated that Hendricks would have made an oral offer to Huseman at a salary he had approved.  <u>Plaintiff's Response</u>, <u>Excerpts from Deposition of Ronald Frillman (Frillman Dep.)</u>, at 39.  Frillman testified that following the oral offer, Hendricks informed him that there was a discrepancy between the amount of salary offered orally and the amount noted in the paperwork.  <u>Id.</u> at 37.  He stated that he believed that the amount of salary offered orally was higher than what was stated in the paperwork.  <u>Id.</u>  He stated that he believed the salary offered orally was $5,684.00.  <u>Id.</u> at 49.  Frillman testified that Senator Donahue called him about Huseman's salary issue.  He stated that his communication with Senator Donahue about Huseman's salary did not have any impact on issues relating to the setting of Huseman's initial salary.  <u>Id.</u> at 92.

The Department ultimately extended an offer to Huseman at a monthly salary of $5,684.00, Step 7, the highest pay step available at that time for the staff pharmacist position.[4]  Huseman accepted the offer and started working at the Veterans Home on April 1, 2001.  Shortly after her

---

[4]The Court notes that Weinand's Response states that, at the time of hire, Huseman was offered a salary of $5,592.00.  <u>Plaintiff's Response</u>, ¶ 53.  It appears that this is a typographical error.  The record evidence indicates that Huseman's starting salary in April 2001 was $5,684.00, Step 7.

hire, in 2001, Huseman obtained her doctorate degree in pharmacy from St. Louis College of Pharmacy.

In April 2001, Weinand was earning $5,045.00 per month, at Step 5. In May or June 2001, while working on the next year's budget, Weinand learned that Huseman was being paid more than he was for the same position. He therefore questioned the Medical Director about the discrepancy in pay, but was directed to discuss the matter with Hendricks, which he did. When Weinand complained to Hendricks about the matter, Hendricks did not answer and refused to discuss the matter. By May 31, 2001, Frillman also became aware that Weinand was being paid less than Huseman.

Weinand, through the Union, filed a grievance complaining that he was discriminated against on the basis of salary. Defendant's Motion, Exh. 16, Weinand's Grievance. At the pre-arbitration level, the Union, however, abandoned Weinand's grievance in order "to devote its resources to preventing privatization of certain functions at departments of the State of Illinois (e.g. dietary services at state prisons)." Affidavit of Deborah Anderson (d/e 40) (Anderson Aff.), ¶ 4. Both Hendricks and Frillman stated that Huseman and Weinand performed the same duties and

11

responsibilities, and reported to the same supervisor.

On July 1, 2001, Weinand's pay step was adjusted from Step 5 to Step 6.  <u>Defendant's Motion</u>, Exh. 6, <u>Personnel History Inquiry for Weinand</u>.  Effective January 1, 2002, an additional step (Step 8) was added to the pay steps for the staff pharmacist position.  In late January 2002, Huseman resigned from the Department.  On July 1, 2002, Weinand received a general increase as well as a step increase to Step 7.  <u>Id.</u>  In October 2002, the Department rehired Huseman at Step 8, the highest pay step available at that time.  On November 30, 2002, Weinand retired from the Department.[5]  In January 2005, Huseman left the employ of the Department.

<u>ANALYSIS</u>

Weinand claims that the Department discriminated against him on account of gender as to the payment of wages in violation of the EPA and Title VII.  The Department moves for summary judgment.  At summary judgment, the moving party must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477

---

[5]The record discloses that in 2003, the Department hired William Postel as a staff pharmacist at the highest available pay step, Step 8.  In 2005, Robert Westerheide was likewise hired as a staff pharmacist at Step 8.

U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to Weinand.  Any doubt as to the existence of a genuine issue for trial must be resolved against the Department.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the Department has met its burden, Weinand must present evidence to show that issues of fact remain with respect to an issue essential to his case, and on which he will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

I.   EQUAL PAY ACT

The EPA prohibits an employer from discriminating against an employee in the payment of wages based on gender.  Varner v. Illinois State University, 226 F.3d 927, 932 (7th Cir. 2000); Corning Glass Works v. Brennan, 417 U.S. 188 (1974).  To establish an EPA violation, Weinand must first show evidence of "unequal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"  Varner, 226 F.3d at 932 (citing 29 U.S.C. § 206(d)(1)).  Once Weinand has met his burden, the Department may avoid liability by showing that the pay disparity is a

13

reflection of: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a factor other than sex.  Id.  "Because a *prima facie* case under the Equal Pay Act requires only an initial showing of a wage differential between the sexes, the Act's remedial provisions do not perfectly mirror the Constitution's prohibition on gender discrimination."  Id.  In other words, even in the absence of a showing of a discriminatory intent, an employer may still be liable under the EPA.  Id.  Further, under the EPA (unlike Title VII), the defendant always bears both the burden of persuasion and production on its affirmative defenses.  Beck-Wilson v. Principi, 441 F.3d 353, 364-65 (6th Cir. 2006). The burden of proving the affirmative defense of a factor other than sex is a heavy one.  Id. at 365.  Accordingly, as the party who bears the burden of persuasion, the Department must show that there is no genuine issue as to whether a factor other than sex accounted for the pay disparity.  Id.

The Department concedes that Weinand can make out a prima facie case under the EPA.  Therefore, the issue is whether the Department has come forward with an affirmative defense for its action and whether it has demonstrated that there is no genuine issue as to whether the difference in pay was based on a factor other than sex.  The Department contends that

factors other than sex were responsible for the pay disparity between Weinand and Huseman.  The Department asserts that its decision to hire Huseman at Step 7, the highest pay step available for the staff pharmacist position in April 2001, was consistent with its gender-neutral practice of hiring individuals for the staff pharmacist position at the highest available pay step, a practice which was driven by market forces.  The Department further asserts that the reason for the difference in pay was a result of the July 2000 salary reconfiguration.

The Court finds that the Department has presented uncontroverted evidence which demonstrates that the disparity in pay between Weinand and Huseman was not based on gender, but based on the Department's gender-neutral hiring practice, which was driven by market forces.  The Seventh Circuit has held that an employer may consider market factors in setting initial salaries for new hires.  Wernsing v. Dept. of Human Services, State of IL, 427 F.3d 466 (7th Cir. 2005).  The evidence shows that this is exactly what the Department did in hiring Huseman at Step 7 in April 2001 and at Step 8 in October 2002.  It is undisputed that the Department had difficulties recruiting individuals to work as staff pharmacists.  The evidence shows that the recruiting problem was due to more competitive

compensation and bonus packages offered in the private sector for pharmacist positions. In seeking approval from CMS for Huseman to be hired at Step 7 in April 2001, the Department accordingly noted in the special salary request form as follows: "[Illinois Veterans Home in Quincy, Illinois] has been recruiting to no avail for a Pharmacist since 5/31/00. The previous incumbent resigned to accept another position with a $10,000 sign-on bonus PLUS $70,000 yearly. K-Mart in our city is offering a $10,000 bonus PLUS an annual salary of $80,000." Plaintiff's Response, Exh. 2, Special Salary Request for Huseman. It is further undisputed that, after Zander left his employ on May 31, 2000, it took the Department approximately one year to fill the vacancy with Huseman.

The evidence further shows that to remain competitive in the given market, the Department developed a practice of hiring individuals for the staff pharmacist position at the highest available pay step. In accordance with this practice, Weinand was hired in April 1990, at Step 7, the highest pay step available at that time. Similarly, Winston, who was hired in 1998, was hired at the highest pay step. This was also true for Zander who was hired in 1999. Additionally, Huseman was hired at the highest available pay step in April 2001, and in October 2002. Two other staff pharmacists

hired in 2003 and 2005, respectively, were hired at Step 8, the highest available pay step during the relevant period.  The evidence in the record, therefore, demonstrates that the Department's gender-neutral hiring practice, which was driven by market forces, accounted for the pay disparity between Weinand and Huseman.  The Court finds that the Department's gender-neutral hiring practice, which was driven by market forces, constitutes a factor other than sex that attributed to the pay difference between Weinand and Huseman.

The Department next contends that the pay disparity between Weinand and Huseman also existed because of the July 2000 salary reconfiguration, which occurred as a result of the negotiations between AFSCME, on behalf of the staff pharmacists and the State of Illinois.  Prior to July 1, 2000, Weinand was paid at Step 7, the highest pay step available at that time.  Under the pay scale implemented in July 2000, Weinand's salary fell at Step 4 because the salary amount on each step had increased. Immediately following the salary reevaluation, Weinand received a general pay increase and a step increase to 5.  As the Department asserts, had there been no such reconfiguration, Weinand would have been paid at the highest pay step at the time of Huseman's hire in April 2001.  This evidence

establishes that the disparity in pay between Huseman and Weinand was due to the July 2000 salary reevaluation, which occurred as a consequence of the negotiations between AFSCME and the State of Illinois.  The Court finds that the July 2000 salary reconfiguration constitutes a factor other than sex that was responsible for the pay disparity at issue here.  See Taylor v. White, 321 F.3d 710, 717-18 (8th Cir. 2003) (finding that an employer's salary retention policy, even if based on subjective standards, qualified as a factor other than sex under the EPA).

Weinand, however, argues that the Department's Motion for Summary Judgment as to his EPA claim should be denied.  He advances several arguments in support of his contention, none of which are persuasive.  Weinand asserts that the fact that Zander, Winston, and he were hired at the highest pay step is not enough to justify the Department's hiring of Huseman at the highest pay step in April 2001 because such a practice would render other pay steps meaningless.  Weinand contends that, "if only the top step has meaning", "why not create just one salary step for pharmacists?"  Plaintiff's Response, at 12.

This argument is unavailing.  The fact that the Department's hiring practice undermines the purpose of different pay steps available for the staff

pharmacist position does not disprove the Department's proffered reason. The EPA "does not authorize federal courts to set their own standards of 'acceptable' business practices. The statute asks whether the employer has a reason other than sex--not whether it has a 'good' reason." Wernsing, 427 F.3d at 468. Furthermore, "[p]roof that the actual reason disserves the employer's interests does not discharge that burden, as long as the employer does not rely on one of the forbidden grounds." Id. at 469. Therefore, the argument that the Department's eight-step pay scale for the staff pharmacist position has no meaning if all staff pharmacists are hired at the highest pay step is unavailing. This Court is not authorized to sit as a super-personnel department and judge the "the wisdom or reasonableness of the asserted defense[,]" even if the stated reason undermines the Department's interests. Taylor, 321 F.3d at 719.

Weinand next argues that "[h]iring Huseman at step 7 defeated the purpose of the reconfiguration of the steps negotiated" in July 2000, approximately nine months before Huseman's employment with the Department. Plaintiff's Response, at 14. According to Weinand, the Department's hiring of Huseman at Step 7 in April 2001, "ma[de] a mockery of the salary steps renegotiated and reconfigured in July, 2000."

Id. at 15.  Again, whether or not the Department's practice of hiring staff pharmacists at the highest available pay step undermined or was contrary to the purposes of the July 2000 salary reconfiguration is not the issue, and such evidence does not rebut the asserted defense.  As discussed supra, this Court is not authorized to evaluate the wisdom or reasonableness of the Department's business practice, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers . . . ."  Wernsing, 427 F.3d at 468.

The July 2000 step adjustment occurred as a result of the negotiations between AFSCME and the State of Illinois to allow staff pharmacists (including Weinand), that had reached the maximum of pay scale, the opportunity to earn a general increase and step increases in the future.  The Department was not involved in the negotiation process.  The undisputed evidence shows that Weinand actually benefitted from the July 2000 salary reconfiguration; while his salary range fell at Step 4 under the pay scale implemented in July 2000, Weinand not only received a general increase, but also a step increase to 5.  Under that pay scale, Weinand was also afforded the opportunity to earn further pay step increases in the future.  Therefore, Weinand's contention lacks merit.

Weinand next asserts that the fact that Winston and Zander, both of whom were hired at the highest pay step, were paid the same as he disproves the Department's stated reason. The Court does not see how this evidence disproves the Department's affirmative defense that a factor other than sex accounted for the salary difference. Rather, the evidence tends to establish that the Department's hiring practice was consistently applied to all staff pharmacists, regardless of gender. Further, when Winston began his employ with the Department in 1998, he earned the same amount of salary as Weinand because both individuals were hired at Step 7 and the salary reconfiguration had not taken effect. Likewise, Zander, who was hired in 1999, was paid the same as Weinand because both individuals were at the same pay step, and the salary reconfiguration had not been implemented at that time.

Next, Weinand contends that, "[t]here is no evidence that Huseman would not have come on board at Plaintiff's salary level." Plaintiff's Response, at 14. Again, Weinand misses the point. Whether or not Huseman would have accepted the employment with the Department at a lower pay step in April 2001 is not the issue here; the issue is whether a factor other than sex accounted for the pay disparity between Huseman and

Weinand.  The fact that Huseman might have accepted the job offer in April 2001 at a lower pay step does not disprove that the difference in pay was a reflection of a factor other than sex.

Weinand lastly argues that the fact that the Department, while acknowledging that it had problems retaining staff pharmacists, failed to raise Weinand's salary to prevent him from leaving the employ of the Department demonstrates that the Department's stated reason is false.  This argument is unavailing.  As discussed <u>supra</u>, federal courts are not authorized to act as a super-personnel department and evaluate the reasonableness of the employer's business decision.  In addition, even if the employer's business policy "disserves" its interests, that evidence does not show that the pay disparity was a reflection of the employer's gender bias.  For these reasons, the Department is entitled to summary judgment as to Weinand's EPA claim.

II.   <u>TITLE VII</u>

Weinand concedes that his Title VII claim fails in light of the Supreme Court's recent decision in <u>Ledbetter v. Goodyear Tire & Rubber Co.</u>, 127 S.Ct. 2162 (2007).  Therefore, the Department is entitled to summary judgment as to Weinand's Title VII claim.

CONCLUSION

THEREFORE, for the reasons set forth above, the Defendant's Motion for Summary Judgment (d/e 36) is ALLOWED.  All pending motions are denied as moot.  The case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:  June 22, 2007.

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE